**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| SONYA EVANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:17-cv-00183-JHE |
| | ) | |
| EPC, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION[1]**

Plaintiff Sonya Evans ("Evans") initiated this action against Defendant EPC, Inc. ("EPC") alleging employment discrimination and retaliation claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981. (Doc. 1). Prior to the close of discovery, on October 10, 2017, EPC moved for summary judgment. (Doc. 16). Evans filed a "Motion for Continuance Pursuant to Fed. R. Civ. P. 56(d)," requesting the deadline to respond to the summary judgment motion be extended to March 8, 2018 (after the close of discovery) because, *inter alia*, depositions had yet to be completed. (Doc. 19). EPC opposed Evans' motion. (Doc. 20). On October 25, 2017, finding the interests of justice required Evans have an opportunity to depose two individuals before a summary judgment motion is considered, the undersigned granted Evans' Rule 56(d) motion and denied EPC's motion for summary judgment without prejudice as premature. (Doc. 21).

After completing the two outstanding depositions, EPC moved for summary judgment. (Doc. 24). Evans filed a response in opposition to summary judgment (doc. 27), and EPC replied

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 11).

(doc. 29). The renewed motion for summary judgment is ripe for review. Based on the foregoing, EPC's renewed motion for summary judgment (doc. 24) is **GRANTED**.

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat

a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

### A. Evans' Employment with EPC

EPC, or "Engineered Plastics Components," is a plastic injection molding company that produces interior automotive components and assemblies. (Doc. 26-1 at ¶ 3). On July 3, 2015, Plant Manager Ben Weber ("Weber") and Human Resources Director Pam Gillard ("Gillard") hired Evans as the third shift production supervisor for EPC. (*Id.* at ¶4; doc 26-2 at 23 (85:12-15, 86:4-12)). Evans went to work for EPC because she had previously worked with Gillard and because she was excited to go work for Gillard again. (Doc. 26-2 at 23 (86:16-23)). Evans and Gillard knew each other on a personal level and had been acquainted for approximately seventeen years, as they both worked together at a previous employer. (*Id.* at 4-5, 13 (10:15-17, 13:11-14:11, 47:19-22)).

In her role as third shift production supervisor, Evans reported to Weber. (Doc. 26-2 at 23 (87:4-10)). From a management standpoint, Evans was the highest-ranking person in the facility on third shift. (*Id.* (87:4-10)). Her shift typically lasted from 10:30 PM to 7:00 AM. (*Id.* (86:4-12)). As third shift production supervisor, Evans was responsible for ensuring the presses were running on time, starting and stopping machinery, handling issues with the machines, making sure the material was accurate, and making sure the employees were doing what they were supposed to be doing. (*Id.* at 23-24 (88:10-89:1)).

As part of the production process, paperwork is filled out for each mold produced at EPC. (Doc. 26-2 at 24 (91:9-92:23)). Five to six employees have a responsibility for filling out a different section of the paperwork and for signing their names to the section to verify the parts and materials. (*Id.*). Evans was familiar with company policies and procedures. (*Id.* (89:2-4)). In fact, it was Evans' responsibility to discipline employees on her shift when they were not doing their job properly, not signing their documents, or not following the proper process. (*Id.* (89:5-90:7)). Evans understood that, as a supervisor or manager, EPC was counting on her to enforce its policies and procedures. (*Id.* at 27 (103:4-7)).

### B. Evans' Relationship with Korey Mendenhall

While working at EPC, Evans met Korey Mendenhall ("Mendenhall"). (Doc. 26-2 at 14 (51:13-19)). Mendenhall, who is African-American,[2] worked as a material handler (an hourly position); Evans supervised Mendenhall. (*Id.* at 10-11, 15 (54:2-4), 36:19-37:1)). According to Evans, she and Mendenhall began dating several months after she started working at EPC. (*Id.* at 14 (51:20-23)). Evans separated from her husband after beginning her relationship with Mendenhall. (*Id.* (51:17-52:7)). Evans and Mendenhall took breaks together and ate their lunches together, fixing each other's lunches, making each other's plates, and sitting down to eat together. (*Id.* at 10, 14-15 (36:14-18, 52-21-53)). Evans believes her co-workers knew they were dating based on these observations (*id.*), and because co-worker John Dodge ("Dodge"),[3] a mold changer, told Evans he couldn't believe she would date a "nigger" and that he "didn't like the fact a white person would date a nigger." (*Id.* at 11-12 (40:14-41:16)). Evans and Mendenhall did not engage in romantic activities at work. (Doc. *Id.* at 14 52:11-17)).

---

[2] Evans is Caucasian.
[3] Dodge was not a decision-maker in Evan's termination. *See infra.*

Gillard began receiving complaints from employees about Evans and Mendenhall as well as complaints that people on Evans' shift took longer break times. (Doc. 26-2 at 41 (159:1-160-11)). Evans understood that employees were not supposed to take extended lunches or breaks. (*Id.* at 26-27 (100:19-101:8)). Evans testified that Gillard told her that, because she was a manager and Mendenhall was an hourly employee, they should not be dating.[4] (*Id.* at 12-13, 27 (43:21-44:4, 45:17-22, 101:9-13)). There was no written rule against dating at EPC. (Doc. 26-4 at 9 (31:1-7)). According to Evans, Gillard told Evans that people were complaining to her about Evans and Mendenhall's relationship on a daily basis, and Gillard did not say that these complaints had anything to do with race. (Doc. 26-2 at 12 (43:6-16)). EPC had an "open door policy" and Gillard had no control over what complaints were made. (*Id.* at 39 (151:3-8)). However, during this conversation Gillard also told Evans that Evans' parents would "not be proud" of her for dating Mendenhall, that her parents "would not agree [with] it." (*Id.* at 13 (45:23-46:7)). Evans' testified, "our conversation was because he was black" (*id.* (46:20-21)), and that "[Gillard] said something about birds of a feather flock together." (*Id.* (48:2-9)). Evans understood this comment to be referring to Mendenhall's race. (*Id.* (48:10-17)). Gillard testified that interracial dating is "not an issue' to her. (Doc. 26-4 at 10 (33:17-19)). Evans described the conversation as talking about how her parents would feel, then talking about Gillard's children and Gillard's feelings. (*Id.* (48:2-9)).

According to Evans, no one made comments to Mendenhall about his relationship with Evans. (Doc. 26-2 at 14 (50:12-20)). And, Mendenhall was never disciplined or had any other

---

[4] According to Evans, during this conversation, Gillard also told her that she shouldn't date a "subordinate" or someone she was supervising because she was management, and Evans admitted she knew that. (Doc. 26-2 at 13 (47:2-10)). Gillard also told Evans that a manager dating an hourly employee didn't "set a good example." (*Id.* at 12 (43:21-44:4)).

issues at EPC.  (*Id.* at 15 (54:9-19)).

Evans alleges two other EPC employees, Paul Klem ("Klem") and Bethany Cross ("Cross"), were in a relationship and that they were never disciplined for taking long lunches. (Doc. 26-2 at 27-28 (103:19-105:16)).  Cross was a Quality Auditor who reported to Alisa Washington.  (Doc. 26-1 at ¶ 18).  Cross and Klem were in a romantic relationship, but Cross did not report to Klem.  (*Id.*).  EPC only prohibits involvement between a supervisor or manager and his or her direct reports.  (*Id.*).  Gillard spoke with Klem about his relationship with Cross and told him he must be professional with his behavior in the work place.  (*Id.*).  Klem was a first shift supervisor, an equivalent management position to Evans.  (Doc. 26-2 at 10 (35:7-9)).

### C.  Evans' Complaints About Race-Based Comments

Evans' reported Dodge's comment to Weber on March 24, 2016.  (Doc. 26-2 at 12, 31 (42:3-14, 118:3-120-22)).  Evans and Mendenhall met with Weber and informed him that people were starting to make racial comments and were treating them differently, that it had been going on for several days, and that they were tired of it and wanted it stopped.[5]  (*Id.* at 31 (118:10-22)). Evans told Weber that she and Mendenhall were coming to him because he was her direct supervisor and she didn't know how Gillard would take it if they were talking about racial discrimination.  (*Id.*).  Weber reminded Evans that she was a supervisor and had authority to discipline any employee on third shift who was causing problems.[6]  (Doc. 26-3 at ¶ 10).   Evans did not discipline any of her subordinate employees for problems of the type she was complaining

---

[5] Weber testifies he does not remember speaking to Evans and Mendenhall together. (Doc. 26-5 at 8 (28:5-7)).

[6] Weber testifies that he does not remember Evans reporting anyone using the "n-word," but that Evans reported employees making "rude remarks."  Specifically, Weber testifies that he does not remember the exact "rude remarks" Evans reported employees making, but that he asked Evans if she was "timid about writing someone up if they're getting in a supervisor's face" and told her to "please go do your job."  (Doc. 26-5 at 8 (27:5-7, 15-23)).

about to Weber.  (*Id.*).  According to Evans, Weber also told her he would investigate the behavior and put a stop to it.  (Doc. 26-2 at 31 (118:3-120:2)).  Weber instructed Evans to write down her specific problems in a notebook for him, and Evans believed this would be used as part of Weber's investigation into her complaint.  (*Id.* at 32 (121:20-122:19)).  Evans testified she was satisfied with Weber's response and that she would "give him a few days, and then, if things didn't change[] that we would be readdressing it with both him and [Gillard]."  (*Id.* at 31 (120:13-18)).

According to Weber, he spoke with Gillard regarding Evans' complaints that employees were "mouthing back."  (Doc. 26-5 at 9 (34:15-23)).  When he spoke to Evans the next day, Weber told her he and Gillard were addressing the issues.  (Doc. 26-2 at 31 (120:3-12)).

## D.  EPC's Training

On March 24, 2016, Evans attended a pre-planned, plant-wide training that addressed the recurring problems of employees taking extended lunch and break times and of employees signing documents with another employee's number.  (Doc. 26-2 at 26-27 (99:2-102:9), 58-60; doc. 26-1 at ¶ 8).  The training made clear to all employees that signing documents with another employee's number is fraud and is cause for immediate termination.  (Doc. 26-2 at 27 (102:7-17); doc. 26-1 at ¶ 8; doc. 26-3 at ¶ 4).  Following this meeting, Evans understood she was not supposed to sign for other people and that she was not supposed to take or permit employees to take breaks for personal reasons.  (Doc. 26-1 at 26 (97:17-98:1, 100:17-23); doc. 26-1 at ¶ 7).

## E.  Evans' Termination

Within four days after the training session that addressed the issues of extended breaks and falsification of documents, Evans falsified another employee's signature and took an extended lunch break.  (Doc. 26-1 at ¶ 9).  On March 25, 2016, Evans and Mendenhall took an extended lunch and left the facility to go to Wal-Mart and pick up a grill.  (Doc. 26-1 at 32 (123:4-7)).  Given

the prior warning, EPC decided to discipline Evans.  (Doc. 26-1 at ¶ 11).  The written warning was prepared on March 28, 2016, but Evans was not available to meet until March 30, 2016.  (*Id.* at ¶12).

Meanwhile, on March 28, 2016, Evans signed Rudy Juran's ("Juran") name on a company document.  (Doc. 26-2 at 34-37 (129:4-131:23), 72).  According to Evans, Juran was several hours behind on his work, and while he was standing on top of a machine, she asked him if he wanted her to sign off for him and he said yes.  (Doc. 26-2 at 25 (94:5-95:21)).   On March 29, 2016, Gillard interviewed Juran, who denied giving Evans permission to sign his name.  (Doc. 26-1 at ¶ 14, 11; doc. 26-2 at 37 (141:10-14)).

At that point, Weber and Gillard felt like they had no choice but to let Evans, a manager, go for violating the policy immediately after the plant-wide training.  (Doc. 26-1 at ¶15; doc. 26-3 at ¶ 6).  On March 30, 2016, Gillard and Weber met with Evans and showed her the start-up sheet and approval checklist at issue and asked her whether she signed Juran's name.  (Doc. 26-2 at 34 (129:4-131:23), 72; doc. 26-3 at ¶ 7).  Evans admitted she signed both Juran's name and her own name on both sheets.   (Doc. 26-2 at 34 (129:4-131:23)).   Following Evans' admission, she had signed Juran's name, Gillard and Weber reread the policy to Evans that she had signed days earlier and informed Evans her employment was being terminated because she falsified documents.  (Doc. 26-2 at 34, 36 (132:5-7, 140:5-10; doc. 26-3 at ¶ 7).  No race-related comments were made to Evans during her termination meeting.  (Doc. 26-2 at 38 (145:18-22)).  Following Evans' termination, she sent a text message to Gillard stating as follows:

> Pam, You know I need my job but I did not sign his name to be malicious.  I did it only to ensure that we did not forget about the paperwork and to help Rudy and myself because we were so busy running between both buildings.  I know those were signed by me and I asked him if he wanted me to sign and he said yes but will probably not admit it thinking he will get in trouble.  Thank you.

(*Id.* at 37 (143:12-144:8), 73). During the meeting, Evans was also given a verbal warning regarding taken a long lunch and picking up a grill with Mendenhall. (*Id.* at 32 (123:1-9), 70). EPC does not dispute that the decision to terminate Evans employment was unrelated to the breaks. (Doc. 26-5 at 19 (72:11-14); doc. 26-4 at 32 (121:3-122:5)).

### F. Evans' Alleged Comparators

Evans contends Alden Johnson ("Johnson"), an hourly employee, signed her initials on a part the same week Evans was terminated. (Doc. 26-2 at 35 (134:5-136:13)). Johnson signing Evans' initials in this way would have been a violation of policy. (Doc. 26-5 at 11 (37:15-38:9)). Johnson was a quality inspector auditor and was an hourly employee, not a manager. (Doc. 26-2 at 9 (29:5-1); doc. 26-1 at ¶ 16). Evans did not learn that Johnson had signed her initials until after she was terminated. (Doc. 26-2 at 9 (30:2-12)). On either March 31, 2016 or April 1, 2016, Evans called Gillard to tell her and talk to her about it, but Gillard told Evans that she did not want to discuss another employee with Evans. (*Id.* at 9, 35-36 (30:2-12, 136:14-20, 139:10-140:2)). Gillard did not inform Weber about Evans' allegations, did not ask Johnson about the allegations, and did not investigate the allegations until after Evans' deposition in this case. (Doc. 26-4 at 15-16 (55:21-57:21)). Management did not have knowledge of any other employees signing or initialing documents in contradiction to the March 24, 2016 training between the time of the training and Evan's termination. (Doc. 26-2 at 35-36 (134:5-137:6); doc. 26-1 at ¶20; doc. 26-3 at ¶ 8).

Evans also offers her own testimony and a declaration from Mendenhall contending an employee named "Debra" affixed other employee's numbers on parts and stickers, and that Mendenhall reported this to Gillard. (Doc. 26-2 at 6-7 (20:5-21:9); doc. 28-2 at 2). Evans' testimony is hearsay, and, notwithstanding that fact, neither her testimony nor Mendenhall's

affidavit provide when this happened so that it can be properly assessed.

Evans contends Kelm and Cross, who are both Caucasian, were treated differently than she and Mendenhall were treated, noting they were affectionate on the floor and took long lunches. (Doc. 26-2 at 28-29 (106:2-107:5, 109:11-15)). Neither Kelm nor Cross was formally disciplined for this behavior (doc. 27 at 4); however, Evans does not know what Weber or Gillard told them about their relationship. (Doc. 26-2 at 29 (109:16-21)). Evans complained to Weber and Gillard about the extended breaks she thought Kelm and Cross were taking together. (*Id.* at 33 (126:17-128:8)). Gillard talked to Kelm and Cross about taking extended lunch breaks, telling them not to do it anymore, and, according to Gillard, they stopped. (Doc. 26-4 at 30 (115:7-21)). Although Cross did not directly report to Kelm, as a supervisor on first shift, Kelm had the authority to discipline Cross. (Doc. 26-5 at 13 (45:9-18); doc. 28-1 at 2). Weber testified that, to his knowledge, Kelm and Cross were not breaking any rules by dating (doc. 26-5 at 12 (45:6-8)), and that his only concern with them dating was that they were spending too much work time together. (*Id.* at 20 (73:5-74:4)).

Other employees, including floor associates, were written-up for taking extended breaks for personal reasons. (Doc. 26-2 at 33 (126:12-16)).

## G. The Decision-Makers

Evans testified that she never witnessed Gillard mistreat an African-American person or mistreat a Caucasian person for associating with an African-American person. (Doc. 26-2 at 23 (85:16-22)). Although Evans believes Gillard is "somewhat" racist, she does not believe Gillard would treat someone poorly because of race. (*Id.* (149:17-150:3)). While at their previous employer, Evans never had problems with Gillard, she believed Gillard to be truthful in her dealings, and Evans never heard Gillard express an opinion on biracial dating during that time.

(*Id.* at 5 (13:11-14:11). At EPC, Evans worked with Gillard in disciplining the employees on her shift. (*Id.* at 24 (14-91:8)). As to these dealings with Gillard, Evans testified that Gillard was always reasonable and was never unprofessional or inappropriate. (*Id.*).

Evans testifies that Weber did not "do anything or act any different way" to make her think he was racist, but that she has a "gut instinct" that he is racist. (Doc. 26-2 at 39 (149:10-16)). Weber relied on Gillard to investigate the allegation Evans had signed Juran's name; anything he knew about the incident came from her. (Doc. 26-5 at 13 (48:5-49:8)). According to Weber, he let Gillard handle the situation and did not have direct involving other than sitting in on the termination meeting. (*Id.*).

### III. Analysis

Evans asserts EPC wrongfully terminated her employment because she was in an interracial relationship and/or in retaliation for complaining about discrimination. (*See* doc. 1).

#### A. Discriminatory Termination

Title VII[7] prohibits an employer from "discriminat[ing] against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Such discrimination claims are typically categorized as either based on a mixed-motive or single-motive theory. *Quigg v. Thomas Ctny. Sch. Dist.*, 814 F.3d 1227, 1235 n.4 (11th Cir. 2016). To prove unlawful discrimination based on a mixed-motive theory, an employee-plaintiff must show that an illegal bias "was a motivating factor for" the adverse employment action, "even though other factors also

---

[7] Both Title VII and § 1981 have the same requirements of proof and use the same analytical framework. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Therefore, the undersigned will expressly address the Title VII claims with the understanding the analysis applies to the § 1981 claims unless indicated otherwise.

motivated" the action.[8]  *Id.* at 1235 (citing 42 U.S.C. § 2000e–2(m); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).   Under either theory, a party can establish its claim with direct or circumstantial evidence.  *Id.*

When evaluating a mixed-motive discrimination claim[9] based on circumstantial evidence at summary judgment, a court is only required to ask whether the plaintiff has offered evidence sufficient for a reasonable jury to conclude, by a preponderance of the evidence, that: (1) the defendant took an adverse employment action against the plaintiff; and (2) a protected characteristic was a motivating factor for the defendant's adverse employment action.  *Quigg*, 814 F.3d at 1239-40 (adopting the framework articulated in *White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008)).  Given that there is no dispute that EPC's decision to terminate Evans' employment constitutes an adverse employment action, the only remaining question is whether Evans has presented sufficient evidence from which a reasonable jury could conclude that her interracial relationship[10] was a motiving factor in EPC's decision to terminate Evans' employment.

---

[8] Single-motive claims, or "pretext' claims, require a showing that bias was the true reason for the adverse action.  *Quigg*, 814 F.3d at 1235 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 251–53 (1981) (considering a single-motive, gender-based discrimination claim)).

[9] Evans argues EPC "had not moved for summary judgment on [Evans'] 'mixed motive' claim . . ." and that it cannot "do so in a reply brief to which [Evans'] would not have the opportunity to respond."  (Doc. 27 at 12-13).  Although EPC framed its summary judgment argument based on the *McDonnel Douglas* framework in its opening brief, EPC did not limit its argument to a "single motive" theory analysis.  Regardless of how the parties characterize their arguments, the question is "if the circumstantial evidence is sufficient to raise 'a reasonable inference that the employer discriminated against the plaintiff.'"  *Robinson v. RockTenn CP, LLC*, 986 F. Supp. 2d 1287, 1304 (N.D. Ala. 2013).  Additionally, while a movant should not raise new legal issues in its reply brief, to the extent there was anything in EPC's reply brief Evans wanted to address, she was free to file a timely motion for leave to file a sur-reply.   She did not.

[10] *See Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986) (recognizing discrimination based on an interracial relationship is race-based discrimination and cognizable under Title VII); *Tomczyk v. Jocks & Jills Restaurants, LLC*, 198 F. App'x 804, 809 (11th Cir 2006) (acknowledging Title VII protects persons in interracial relationships).

Evans argues that a reasonable jury could find Gillard was "the primary moving force" (or primary decision-maker) behind her termination and that Gillard's "animus regarding [Evans'] interracial relationship 'remain[ed] a causal factor' in the ultimate adverse employment action." (Doc. 27 at 13-14).

**1. Gillard's Counseling and "Birds of a Feather" Comment**

In support of her discrimination claim, Evans first argues that, while EPC had no policy forbidding dating in the work place, "Gillard repeatedly spoke to [Evans] about her interracial relationship in racially tinged terms, telling [Evans] her parents would not be proud of her." (Doc. 27 at 14). This assertion overstates the evidence and conflates several different aspects of Gillard and Evans' interactions, where the evidence shows only one part of a more personal conversation touched on race. Specifically, Evans testified that Gillard came to her and told Evans other employees were complaining about her and Mendenhall as well as people on Evans' shift taking longer breaks. (Doc. 26-2 at 41 (159:1-160-11)). Gillard did not say these complaints had anything to do with race. (*Id.* at 12 (43:6-16)). According to Evans, Gillard told her that because she was a manager and Mendenhall was an hourly employee, they should not be dating and that "[i]t didn't set a good example." (*Id.* at 12-13, 27 (43:21-44:4, 45:17-22, 101:9-13)). However, Evans testifies that during the conversation she wanted to be open and honest with Gillard, whom she had known for years, because she had not really talked with anyone about her relationship with Mendenhall. (*Id.* at 13 (45:17-46:7)). At that point, when Evans opened up about her relationship for the first time, Evans testifies, Gillard told Evans that Evans' "parents would not be proud of [her] for that" and that "[t]hey would not agree to it." (*Id.*). Evans agreed (about her parents' sentiments). (*Id.* (46:5-17)). Evans also testifies that they talked about Gillard's feelings and her children, and that Gillard "said something about birds of a feather flock together," which she

13

understood to relate to race.  (*Id.* (48:1-13)).

Viewing this testimony in the light most favorable to Evans, it appears that, during a work-related conversation between Evans, the employee/supervisor, and Gillard, the HR Manager, the two, who had known each other for years, had a more personal exchange.  After Evans confided in Gillard about her relationship, Gillard brought up her concern about what Evans' parents would think, concerns with which Evans agreed.  To the extent Evans argues the conversation was about Gillard's feelings, the only comment that can be attributed to Gillard is that "she said something about birds of a feather flock together."  (Doc. 26-2 at 13 (48:6-9)).  It is reasonable to infer that this comment related to race.

Citing several Eleventh Circuit cases, Evans argues for the proposition that a discriminatory animus or motive can be inferred from a broad, derogatory statement and, because of the breadth of the statement, that evidence may obviate the need for inferences about the speaker's motivation.  (Doc. 27 at 15).  In *EEOC v. Alton Packaging Corp.*, the Eleventh Circuit held that general racially discriminatory statements made by two decision makers constituted direct evidence of those decision makers' failure to promote black employees for discriminatory reasons.  901 F.2d 920, 924 (11th Cir. 1990).  One decision maker had allegedly said that, if it were his company, he would hire no black people.  *Id.*  The other person allegedly told a black employee that "you people can't do a thing right."  *Id.*  Evans' proposition is correct, that "[w]hen employers . . . without concern for particulars, make broad, derogatory statements about a gender or a race and, thus, demonstrate a general discriminatory animus toward that protected group, the scope of that evidence can be as broad as the broad statements."  *Burrell v. Bd. of Trustees of Ga. Military College*, 125 F.3d 1390, 1394 n.7 (11th Cir. 1997).  However, the *Burrell* court also recognized that discriminatory statements that are "narrowly tailored to a particular event" other

14

than the event in question do not rise to the level of direct evidence as discussed in *Alton Packaging*. *Id.* While Gillard's comment can be construed as her not favoring interracial relationships, it does not relate to any employment decision and is "narrowly tailored to a particular event." *See Burrell*, 125 F.3d at 1397 n.7. While this statement is not direct evidence, it remains a piece of circumstantial evidence, and therefore the court must consider the statement, as a well as the exchange about Evans' parents, when read in conjunction with the entire record. *See Ross v. Rhodes Furniture*, 146 F.3d 1286, 1292 (11th Cir. 1998).

Other comments about race or interracial relationships, such as Dodge's comment, were made by non-decisionmakers and therefore are not relevant to this analysis.

### 2. Verbal Warning for Long Breaks and Lunches

Next, Evans points to the verbal warning she received during her termination meeting for taking a long lunch and picking up a grill with Mendenhall as evidence of Gillard's discriminative motive.[11] (Doc. 27 at 16-17). Evans contends EPC failed to discipline Kelm and Cross, who were both Caucasian, for taking long lunches together. (*Id.*). Despite Evans' generalized comparison of the two situations, the evidence does not support the assertion that Kelm and Cross were treated more favorably. To the contrary, Gillard also counseled Kelm and Cross about taking extended lunch breaks, telling them not to do it anymore, and they stopped. (Doc. 26-1 at ¶ 18; doc. 26-4 at 30 (115:7-21)). There is no evidence that Kelm and Cross continued to take long breaks after being counseled on the issue or after the March 24, 2016 training session. To that end, there is no evidence Kelm and Cross were treated more favorably than Evans and Mendenhall.

### 3. Comparator Evidence

---

[11] It is undisputed that the verbal write-up Evans received during her termination meeting was not a factor in the termination decision. (Doc. 26-5 at 19 (72:11-14); doc. 26-4 at 32 (121:3-122:5)).

Evans also asserts that two other employees – Johnson and Debra – falsified an employee's signature or employee number but were not terminated. (Doc. 27 at 17-20). Evans argues this "comparator" evidence shows differential treatment and that a reasonable jury could infer there was another motivating factor for her termination, i.e., her interracial relationship, since Johnson and Debra were not terminated. (*Id.*). Generally, "[i]n a comparator analysis, the plaintiff is matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the plaintiff has been treated differently than others who are similar to h[er]." *MacPherson v. Univ. of Montevello*, 922 F.2d 766, 774 n.16 (11th Cir. 1991). The court must evaluate the qualifications of the purported comparators as well as their conduct and the context in which they acted to determine if they are similarly situated to the plaintiff. *See Nix v. WLCY,* 738 F.2d 1181, 1186 (11th Cir. 1984); *Burke-Fowler v. Orange Cty, Fla*., 447 F.3d 1319, 1325 (11th Cir. 2006).[12] The burden is on Evans "to show a similarity between [her] conduct and that of [other] employees who were treated differently and not on [EPC] to disprove their similarity." *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (citations omitted).

EPC argues Johnson and Debra are not proper comparators because, at the time of Evans' termination, Gillard and Weber were not aware of Johnson or Debra's alleged violations, and

---

[12] As noted, because Evans is proceeding under a mixed-motive theory of discrimination, she is not required to identify a similarly-situated comparator who was not in an interracial relationship and who was treated differently under the prevalent *McDonnell Douglas* framework. However, even under a single-motive theory of discrimination, if a plaintiff "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent," she "will always survive summary judgment." *Smith v. Lockheed–Martin*, 644 F.3d 1321, 1328 (11th Cir.2011). *See Quigg*, 814 F.3d at 1239-40 (adopting the framework articulated in *White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008)). Thus, while a "comparator" is not required for this claim to survive summary judgment, such differential treatment can be circumstantial evidence to consider when determining if there is a reasonable inference that the employer discriminated against the plaintiff. *See Lockheed–Martin*, 644 F.3d at 1328.

because neither Johnson nor Debra is "similarly situated" to Evans because they were not supervisors. (Doc., 24 at 16-18; doc. 29 at 13-14).

The day after she was terminated, Evans contacted Gillard and told her Johnson had signed her (Evans') initials and that she wanted to talk about it. (Doc. 26-2 at 9, 35-36 (30:2-12, 136:14-20, 139:10-140:2)). As to Debra, it appears the alleged violation took place nearly a year after Evans' termination. (Doc. 26-2 at 6-7 (20:5-21:9); doc. 28-2 at 2). Although, at the time of Gillard and Weber's decision to terminate Evans' employment they did not know about these other alleged violations, the fact that they learned of the alleged violations later and took no disciplinary action may support an inference that there were other considerations involved in Evans' termination. The court must look to the remainder of the evidence to see if there is evidence those "other considerations" were discriminatory.

While the parties agree all employees were subject to the policy forbidding falsification of employee signatures and employee numbers, there are many other factors to consider. For example, the Eleventh Circuit has found that an employee who may have broken a rule but was not caught was not similarly situated to one who had been caught. *See Bogle v. Orange Cnty. Bd. of Cnty. Comm'rs*, 162 F.3d 653, 658-59 (11th Cir. 1998). Likewise, the Eleventh Circuit has held an employee who admitted to improper conduct was not similarly situated to one who did not. *Abel v. Dubberly*, 210 F.2d 1334, 1339 (11th Cir. 2000). Evans, unlike her purported comparators, admitted to the falsifications after being caught.

As Evans argues, "[t]he relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies." (Doc. 27 at 17-18); *Lathem v. Dept. of Children and Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999). However, as another court in this Circuit has recognized, although the same rule may apply to all employees,

"[h]igher level employees are expected to set standards for lower-level employees, and therefore it is entirely reasonable for an employer to tolerate certain misconduct from lower-level employees that it would not tolerate from higher-level employees." *Thompson v. Tyson Foods, Inc.*, 939 F. Supp. 2d 1356, 1367 (M.D. Ga. 2013).

Unlike Evans, neither Johnson nor Debra were a supervisor with direct reports. Evans was the highest-ranking person in the facility on third shift (doc. 26-2 at 23 (87:4-10), and it is not unreasonable for EPC to hold Evans to a higher level of responsibility, professionalism, standards of behavior, and performance expectations than other non-supervisor/non-management employees. *See Thompson*, 939 F. Supp. 2d at 1367-68. Evans herself testified that, as third shift supervisor, she was responsible for making sure the employees were doing what they were supposed to be doing. (Doc. 26-2 at 23-24 (88:10-89:1)). Notably, Evans (as well as all other employees) had been trained on this issue four days earlier. Evans was caught violating policy and admitted to the violation. In this situation, it was not unreasonable for an employer to expect Evans to lead the way following a policy she was recently trained on, especially since she was responsible for making sure other employees did what they were supposed to. (*See id.*).

Thus, based on the foregoing, the probative value of the alleged differential treatment of Evans and her purported comparators is limited. Although, assuming Evans and her purported comparators committed a similar infraction, but the purported comparators were not terminated (or otherwise disciplined), there are many non-discriminatory reasons supporting EPC's decision to terminate Evans' employment. While those reasons alone do not disprove bias or animus as a motivating factor, there is scant evidence that such differential treatment was because Evans was in an interracial relationship. Mendenhall, who was also in an interracial relationship (with Evans), was never disciplined, terminated, or otherwise discriminated against at EPC. (Doc. 26-2 at 15

(54:5-19)).    Moreover, Evans testified that she never witnessed Gillard mistreat an African-American person or mistreat a Caucasian person for associating with an African-American person. (Doc. 26-2 at 23 (85:16-22)).    Although Evans testifies that she believes Gillard is "somewhat" racist, she does not believe Gillard would treat someone poorly because of race.  (*Id.* (149:17-150:3)).    While at their previous employer, Evans never had problems with Gillard, she believed Gillard to be truthful in her dealings, and Evans never heard Gillard express an opinion on biracial dating during that time.  (*Id.* at 5 (13:11-14:11)).    At EPC, Evans worked with Gillard in disciplining the employees on her shift.  (*Id.* at 24 (14-91:8)).    As to these dealings with Gillard, Evans testified that Gillard was always reasonable and was never unprofessional or inappropriate. (*Id.*).

Having reviewed the evidence, and construing any disputes in Evans' favor, Evans has not presented sufficient evidence from which a reasonable jury could conclude that her interracial relationship was a motivating factor in EPC's decision to terminate Evans' employment.    EPC, specifically Gillard with approval from Weber, decided to terminate Evans' employment when she learned Evans – a supervisor with the responsibility to make sure others followed policy – falsified another employees signature on a work document four-days after being retrained on this policy. Although a jury could reasonably interpret Gillard's "birds of a feather" comment as indicative of Gillard disapproving of interracial relationships, there is no support that any such belief played any role in Gillard's work-place decisions, specifically the decision to terminate Evans' employment.    Evans' testimony supports the fact that Gillard was fair and non-biased in administering discipline.  Likewise, there are no teeth to Evans' argument that management treated Kelm and Cross differently, as both couples were counseled against taking extended breaks and lunches, and the evidence shows Kelm and Cross stopped once counseled.  Finally, to the extent

Evans' purported comparators show differential treatment, the evidence establishes they were not similarly situated. Evans was a supervisor with direct reports who was caught violating a policy on which she was recently retrained and admitted to the violation.

There is insufficient circumstantial evidence to raise a reasonable inference that Evans' interracial relationship was a motiving factor in EPC's decision to terminate Evans' employment. EPC is due summary judgment on this claim.

## B. Retaliatory Discharge

Title VII's anti-retaliation provision makes it unlawful for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice . . . , or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir.2008) (alterations in original) (citing 42 U.S.C. § 2000e–3(a)). Under the *McDonnell Douglas* framework,[13] a plaintiff may establish a *prima facie* case of retaliation under Title VII by showing that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between the adverse employment action and protected activity. *Brush v. Sears Holdings Corp.*, 466 Fed. App'x 781, 786 (11th Cir. 2012). Close temporal proximity between protected activity and an adverse action is sufficient to show a causal relationship. *Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002). The awareness by the decision-maker of protected conduct, in conjunction with temporal proximity of adverse employment action to protected conduct, is sufficient to create a factual issue about the causal link requirement. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163-1164

---

[13] Although she argues *McDonnell Douglas* framework is not the only way a plaintiff can prove her case (doc. 27 at 20 n.8), Evans fails to otherwise demonstrate a "triable issue of fact."

(11th Cir. 1993). Only once a *prima facie* case is established, does the court need to turn to the burden-shifting inquiry, i.e., articulation of some legitimate, non-retaliatory reason for the employment action by the defendant and plaintiff's showing of pretext regarding the defendant's statement reasons for the employment action. *Bush*, 466 Fed. App'x at 786 (citing *McDonnell Douglas*, 411 U.S. at 802-04).

Here, although there is close temporal proximity between Evans' complaints of discrimination and her subsequent termination, any inference of a causal connection between those two events is broken by Evans' intervening policy violation – falsifying another employee's name. Such intervening misconduct severs the causal connection (if any) between Evans' complaint of discrimination and EPC's decision to terminate her employment. *See Hankins v. AirTran Airways, Inc.*, 237 Fed. App'x 515, 520-21 (11th Cir. 2007); *see e.g., DeLeon v. ST Mobile Aerospace Eng'r, Inc.*, 684 F. Supp. 2d 1301, 1326 (S.D. Ala. 2010); *Wu v. Southeast-Atlantic Bev. Corp.*, 321 F. Supp. 2d 1317, 1337 (N.D. Ga. 2004). Accordingly, Evans cannot state a *prima facie* case for retaliation. To the extent she argues she has otherwise presented evidence to raise a reasonable inference of intentional retaliation (doc. 27 at 20 n.8), Evans' argument fails. In addition to arguing close temporal proximity, Evans points to purported comparators, discussed *supra*. (Doc. 27 at 22-25). The same analysis applies here, as applied to her discrimination claim. Neither Johnson nor Debra, the purported comparators, admitted to violating the no falsification policy after being caught four days after retraining on the policy. Likewise, neither Johnson nor Debra were supervisors with direct reports entrusted to make sure other employees did what they were supposed to.

Evans fails to state a *prima facie* case for retaliation because there is insufficient evidence from which a reasonable jury could find a causal connection, as her intervening policy violation

severed any such connection. Likewise, Evans has shown no triable issue of fact. EPC is due summary judgment on this claim.

## IV. Conclusion

There being no genuine issue of material fact, EPC is entitled to judgment as a matter of law as to Evans' discrimination and retaliation claims.

DONE this 20th day of September, 2018.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE